**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEN STROMBORG,<br>5059 Larsenville Rd.<br>Denmark, WI  54208, | )<br>)<br>) |
| | ) |
| BILL KOONZ,<br>1429 S. Prospect St.<br>Shawano WI  54166, | )<br>)<br>) |
| | ) |
| JAMES LUDWIG,<br>2 Victoria St.<br>St. Thomas, ON, N5G 2E1 / CANADA | )   Case No. 14-1807<br>)<br>)   COMPLAINT FOR DECLATORY |
| | )   AND INJUNCTIVE RELIEF AND |
| MARK TWEEDALE,<br>2333 Longtail Bach Lane<br>Suamico, WI 54173, | )   VACATUR<br>)<br>) |
| | )   October 29, 2014 |
| DENNIS WILD,<br>118 Vista Drive<br>Highland, NY 12528, | )<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| PUBLIC EMPLOYEES FOR<br>ENVIRONMENTAL RESPONSIBILITY,<br>2000 P Street NW, Suite 240<br>Washington, D.C. 20036, | )<br>)<br>)<br>) |
| | ) |
| **Plaintiffs**, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES FISH AND WILDLIFE<br>SERVICE, an administrative agency of the<br>United States Department of the Interior,<br>1849 C Street NW, Room 3331<br>Washington, DC 20240, | )<br>)<br>)<br>)<br>) |
| | ) |
| and | ) |
| | ) |
| DAN ASHE, Director, United States Fish and<br>Wildlife Service, in his Official Capacity,<br>1849 C Street NW, Room 3331<br>Washington, DC 20240 | )<br>)<br>)<br>) |
| | ) |
| <u>    **Defendants**.    </u> | ) |

**COMPLAINT**

Plaintiffs Ken Stromborg, Bill Koonz, James Ludwig, Mark Tweedale, and Dennis Wild, on their own behalf; and Public Employees for Environmental Responsibility on behalf of itself and its members, allege as follows:

**NATURE OF ACTION**

1.      This action concerns the Defendants' authorization of the killing of tens of thousands of double-crested cormorants (*Phalacrocorax auritus*) without adequate review under the National Environmental Policy Act (NEPA).  Defendant U.S. Fish and Wildlife Service (FWS or "the Agency") recently renewed the Aquaculture Depredation Order (AQDO, 50 C.F.R 21.47, enacted in 1998) and the Public Resource Depredation Order (PRDO, 50 C.F.R. 21.48, enacted in 2003) (collectively, "the Orders"), which authorize freshwater commercial aquaculture producers, State fish and wildlife agencies, federally-recognized Tribes, and United States Department of Agriculture (USDA), Animal and Plant Health Inspection Service (APHIS), Wildlife Services to kill double-crested cormorants (DCCOs).  FWS renewed the AQDO in 2003 concurrent with the initial promulgation of the PRDO after issuing a Final Environmental Impact Statement (2003 FEIS).  In 2009, FWS extended the Orders for five additional years based on an environmental assessment (EA).  Plaintiffs now challenge FWS's *second* five-year extension of the Orders based on an insufficient EA and because of the Agency's failure to produce an environmental impact statement (EIS).

2.       FWS has violated NEPA by engaging in a major federal action significantly affecting the quality of the human environment without preparing an EIS as required by NEPA.

3.       FWS has additionally violated NEPA by relying upon an EA that is insufficient to justify FWS' Finding of No Significant Impact (FONSI) for the grant of a second five-year

1    extension of the Orders.  First, the 2014 FEA fails to show that DCCO suppression measures

2    over the past decade have had an appreciable impact on the fish populations that such measures

3    were supposed to protect.  Thus, the EA fails to show that the "need" to reduce DCCO

4    populations that FWS deemed to exist in 2003 still continues today.  Second, the EA fails to

5    address many factors that make the impact "significant" under NEPA, thereby requiring an EIS;

6    these factors include the uncertainty of the effects on the environment, the controversial nature of

7    the issue, the degree to which a second extension without full NEPA review may establish a

8    precedent for future actions, and the magnitude of environmental consequences such as the

9    introduction of lead into sensitive aquatic environments, the effects of state implementation

10   programs that lack take limits and sufficient oversight, and the effect upon co-nesting and look-

11   alike birds.  Additionally, the 2014 FEA considers only three alternatives, none of which

12   includes modification of the Orders or other mitigating measures that commenters presented.

13   Finally and fundamentally, FWS renewed the Orders based on the conclusion that killing tens of

14   thousands of DCCOs makes a significant impact on the goals purportedly to be achieved, yet

15   FWS simultaneously asserts that the continued slaughter of these birds has no "significant

16   impact" under NEPA.  Such an oxymoron of semantics is antithetical to both the spirit and the

17   letter of NEPA.  For these reasons, FWS's action is arbitrary, capricious, contrary to law, and

18   therefore violates NEPA and the Administrative Procedure Act (APA).

19          4.      Plaintiffs seek a declaration that Defendants have violated NEPA and the APA.

20   Plaintiffs also seek vacatur of the Orders' five-year extensions until Defendants have

21   satisfactorily fulfilled their statutory obligations under NEPA.

1        **JURISDICTION AND VENUE**

2        5.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C

3    § 1331 (federal question) and 28 U.S.C. § 2201 (declaratory judgment).  Venue in this Court is

4    proper under 28 U.S.C. § 1391(e).  Defendants, having authority over the action or inactions

5    alleged herein, have offices located in this judicial district.

6        **PARTIES AND STANDING**

7        6.       Plaintiff PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY

8    (PEER) is a national nonprofit organization, based in Washington, D.C. with field offices

9    throughout the United States, including in Florida and Tennessee, states in which the Orders

10    authorize the killing of DCCOs.  PEER serves and protects current and former federal and state

11    employees of land management, wildlife protection, and pollution control agencies who seek to

12    promote an honest and open government and help hold governmental agencies accountable for

13    faithfully implementing and enforcing the environmental laws entrusted to them by Congress.

14    PEER represents thousands of local, state, and federal government employees nationwide, in

15    addition to ordinary citizens who support PEER's work.  In addition to partaking in recreational

16    activities involving DCCOs, members of PEER research and photograph DCCOs in many of the

17    twenty four states that the Orders impact.

18        7.       FWS's decision to reauthorize the Orders without first conducting a full EIS

19    injures the recreational, professional, and educational interests of those PEER members who

20    regularly view, study, and photograph these animals in the wild.

21        8.       Plaintiff KEN STROMBORG is a Wisconsin resident and retired Fish and

22    Wildlife Service Biologist with a Ph.D. and 40 years of experience as a professional wildlife

23    biologist.  He continues to practice his profession post-retirement from the federal government,

1    conducting research and participating in professional activities as a volunteer.  Dr. Stromborg

2    conducted research on the ecotoxicology of pollutants in the Great Lakes using DCCOs as a

3    sentinel species for approximately fourteen years, which led to a population research program at

4    FWS for approximately seven years that continues today.  To date, his research for FWS has

5    resulted in 17 publications in peer reviewed scientific journals, 10 technical presentations at

6    scientific meetings, and 23 poster presentations.  This included detailed studies of several DCCO

7    populations as recently as the summer of 2014.  He has banded 28,000 cormorants for population

8    studies and will continue studying DCCOs in the future.  FWS's violations of law harm Dr.

9    Stromborg's scientific interests in studying DCCOs in the Great Lakes region.  The unscientific

10   basis of the FWS action also offends his ethical and aesthetic sensibilities as a dedicated wildlife

11   professional and environmentalist.  He submitted comments as a member of the public on the

12   2009 EA, the 2012 Notice of Intent to produce a Supplementary EIS, and the 2014 EA and draft

13   decision.  Earlier, while still employed by FWS, he participated in a variety of FWS forums

14   concerning DCCO management actions.

15        9.    Plaintiff BILL KOONZ is a retired wildlife biologist and resident of Wisconsin.

16   During his 30 year career, Mr. Koonz studied colonial waterbirds, including DCCOs, and visited

17   hundreds of colonies, banded birds, took aerial photos, collected over 10,000 food samples, and

18   collected eggs for pollution studies and studies on the incidence of a defect that produces crossed

19   bills. Although his major work was in Manitoba where some 200,000 pairs of cormorants breed

20   annually, he also visited sites on Lake Michigan off Wisconsin.  He has authored dozens of

21   papers and presentations related to DCCOs and waterbird management.  More recently, Mr.

22   Koonz submitted comments on the 2014 EA, and continues to advise and assist people currently

1    involved in DCCO research.  FWS's violations of law injure the recreational, professional, and

2    academic interests of Mr. Koonz.

3          10.     Plaintiff JAMES LUDWIG is an ecotoxicologist who holds a Ph.D. in ecology

4    and who has observed and studied DCCOs consistently since 1976.  Although he currently

5    resides in Canada, much of his career focused on Michigan and Wisconsin.  Dr. Ludwig has

6    published two peer-reviewed papers on DCCO population analysis, and two papers on the

7    DCCO diet in the upper three Great Lakes from May through August samplings (one peer-

8    reviewed and the other a Michigan Department of Natural Resources [MDNR] in-house analysis

9    that was reprinted in summary form in Wildlife monographs under MDNR senior author Glen

10   Belyea).  Additionally, Dr. Ludwig published nine peer-reviewed papers on contaminant effects

11   in DCCOs and other species as they relate to fisheries interaction; one of these is among the 50

12   most cited papers in the entire contaminant literature.  Dr. Ludwig also published a book entitled,

13   *The Dismal State of the Great Lakes: An ecologist's analysis of why it happened and how to fix*

14   *the mess we have made.*  (XLibris 2013.)  This book focuses on the on the natural history and

15   politics of the Great Lakes system, much of it illustrated by Dr. Ludwig's lifelong interest in

16   colonial bird ecology.  The Ludwig family has been involved in bird banding and research for at

17   least three generations and their data have been vital to much of what the scientific community

18   knows about these birds in this ecosystem.  In the course of his studies, Dr. Ludwig banded over

19   74,000 DCCO chicks. Since 1996, Dr. Ludwig has continued to observe and study DCCOs in the

20   Great Lakes region and plans to continue doing so in the future.  FWS's violations of law harm

21   Dr. Ludwig's recreational and academic interest in viewing and studying DCCOs in the Great

22   Lakes region.

1        11.    Plaintiff MARK TWEEDALE is a birder, wildlife enthusiast, and Wisconsin

2    resident.  He spends roughly two to four hours every day observing nature from an observation

3    tower on his property on Dead Horse Bay in Wisconsin. When DCCOs are present on the bay,

4    Mr. Tweedale observes their behavior on a daily basis, and in recent years has noted a significant

5    decline in the number of DCCOs present.  He is also a recreational fisher and feels that

6    government efforts to make fishing easier by eliminating predators are profoundly misguided and

7    negatively impact his fishing experience.  FWS's violations of law injure the recreational

8    interests of Mr. Tweedale.

9        12.    Plaintiff DENNIS WILD resides in New York and is a birder, recreational

10    fisherman, and wildlife enthusiast.  Mr. Wild observes and photographs DCCOs several times

11    per year, in both New York and Massachusetts. Mr. Wild also authored a book on DCCOs, *The*

12    *Double-Crested Cormorant: Symbol of Ecological Conflict* (University of Michigan Press,

13    2012), which featured a number of photographs he had taken of DCCOs.  Mr. Wild intends to

14    continue observing and photographing DCCOs in the future.  As a fisherman, Mr. Wild does not

15    see the DCCO as a competitor, but as an enhancement to the outdoor experience.  FWS's

16    violations of law harm Mr. Wild's recreational and professional interest in viewing and

17    photographing DCCOs in New York's Hudson Valley Region.

18        13.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the Federal

19    agency responsible for protecting, restoring, and managing migratory bird populations. In doing

20    so, FWS must comply with NEPA and the APA.

21        14.    Defendant DAN ASHE, Director, UNITED STATES FISH AND WILDLIFE

22    SERVICE, is ultimately responsible for the challenged Orders and the agency's compliance with

23    NEPA.

1    15.    The above-described academic, aesthetic, professional, and recreational interests

2    of the Plaintiffs have been, are being, and will continue to be adversely affected and irreparably

3    injured by the Defendants' failure to prepare an EIS and by Defendants' reliance upon an

4    insufficient EA to issue a FONSI and approve a second extension of the Orders.

5                                **STATUTATORY FRAMEWORK**

6    *Migratory Bird Treaty Act*

7    16.    The Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq*., implements

8    several international migratory bird-related treaties as law, including the treaty applicable to

9    double-crested cormorants: the Convention between the United States of America and the United

10   Mexican States for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7,

11   1936, 50 Stat. 1311, amended on February 7, 1936, U.S.-Mex., Mar. 10, 1972, 23 U.S.T. 260.

12   17.    The MBTA makes it "unlawful at any time, by any means or in any manner,"

13   *inter alia*, to "take" birds listed in the relevant treaties. 16 U.S.C. § 703(a). To "take" a bird

14   means "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt,

15   shoot, wound, kill, trap, capture, or collect" it.  50 C.F.R. § 10.12.

16   18.    The MBTA gives the United States Secretary of the Interior the authority to

17   promulgate regulations allowing the taking of birds to an extent compatible with the conventions

18   and based upon due regard for a variety of listed factors.  16 U.S.C. § 704.  This authority has

19   been sub-delegated by the Secretary to FWS.  *See* 50 C.F.R. § 10.1.

20   *National Environmental Policy Act*

21   19.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R.

22   § 1500.1(a).  The NEPA process is meant to "help public officials make decisions that are based

1    on understanding of environmental consequences, and to take actions that protect, restore, and

2    enhance the environment." *Id*. § 1500.1(c).

3         20.    To accomplish these purposes, NEPA requires all federal agencies to prepare a

4    "detailed statement" regarding all "major federal actions significantly affecting the quality of the

5    human environment," 42 U.S.C. § 4332(C), including situations where several separate actions

6    may have a cumulatively significant impact on the environment. 40 C.F.R. § 1508.27(b)(7). This

7    "detailed statement" is commonly known as an environmental impact statement.  Council on

8    Environmental Quality (CEQ) regulations list a number of factors that an agency must consider

9    in evaluating whether an action will have a significant impact on the human environment such

10   that the agency must prepare an EIS.  40 C.F.R. § 1508.27.

11        21.    The CEQ regulations define the term "significantly" as used in NEPA to require

12   consideration of the intensity of the impact, including factors such as:

13        a.   "The degree to which the effects on the quality of the human environment are

14             likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4);

15        b.   "The degree to which the possible effects on the environment are highly

16             uncertain or involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5);

17        c.   "The degree to which the action may establish a precedent for future actions

18             with significant effects or represents a decision in principle about a future

19             consideration," 40 C.F.R. § 1508.27(b)(6); and

20        d.    "Whether the action threatens a violation of Federal, State, or local law or

21             requirements imposed for the protection of the environment," 40 C.F.R.

22             § 1508.27(b)(10).

22.     Agencies may prepare an environmental assessment in order to determine whether an EIS is necessary. 40 C.F.R. § 1501.4.  An EA serves, *inter alia*, to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," 40 C.F.R. § 1508.9(a)(1), and must discuss the need for the proposal, alternatives as required by section 102(2)(E) of NEPA, the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted. 40 C.F.R. § 1508.9(b).

23.     If an agency decides not to prepare an EIS, it must prepare a finding of no significant impact, which explains the agency's reasons for its decision.  40 C.F.R. §§ 1501.4(e); 1508.13.

24.     NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This requirement is independent of the determination whether or not to prepare an EIS. An alternatives analysis must be prepared if an EA is required.  *See* 40 C.F.R. § 1508.9(b).

25.     NEPA's implementing regulation at 40 C.F.R. § 1500.1(b) provides in part that: "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.  The information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. . . ."

26.     The CEQ regulations at 40 C.F.R. § 1506.1 further provide that: "(a) Until an agency issues a record of decision [on an EIS] … no action concerning the proposal shall be

1     taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of

2     reasonable alternatives."

3         27.      Even after a NEPA process is completed, an agency must prepare supplements to

4     draft or final EISs when "significant new circumstances or information relevant to environmental

5     concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii).

6     ***Administrative Procedure Act***

7         28.      The Administrative Procedure Act authorizes courts reviewing agency actions to

8     hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and

9     capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. §

10    706(2)(A). EISs and EAs issued under NEPA are reviewed under this provision of the APA.

11                                        **FACTS**

12    ***Facts relating to the Orders and their extensions***

13         29.      In December 2001, FWS released a Draft EIS (DEIS) for public comment on a

14    proposal to extend the Aquaculture Depredation Order (AQDO, 50 C.F.R 21.47, enacted in

15    1998) and to create a new Public Resource Depredation Order (PRDO). *Notice of Availability;*

16    *Draft Environmental Impact Statement on Double-Crested Cormorant Management,* 66 Fed.

17    Reg. 60,218 (Dec. 3, 2001). The DEIS presented six management alternatives: 1) no action; 2)

18    only non-lethal management techniques; 3) expansion of existing cormorant management

19    policies; 4) a new depredation order; 5) reduction of regional cormorant populations; and 6)

20    frameworks for a cormorant hunting season. *Id.*

21         30.      Subsequently, FWS published a final EIS on DCCO management in the United

22    States. *See Final Environmental Impact Statement on Double-Crested Cormorant Management,*

23    68 Fed. Reg. 47,603 (Aug. 11, 2003). The 2003 FEIS cited increasing DCCO population and

1    human-DCCO conflicts, particularly with aquaculture operations, as primary reasons for

2    managing DCCO populations.

3         31.    On October 8, 2003, FWS published final regulations for the AQDO (extending

4    50 C.F.R. 21.47) and PRDO (establishing 50 C.F.R. § 21.48).  Under the 2003 final regulations,

5    both Orders were to expire on April 30, 2009.

6         32.    The PRDO applies in 24 states: Alabama, Arkansas, Florida, Georgia, Illinois,

7    Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, New

8    York, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Vermont, West

9    Virginia, and Wisconsin. This order authorizes State fish and wildlife agencies, federally-

10   recognized Tribes, and USDA APHIS Wildlife Services to take DCCOs to protect fish, wildlife,

11   plants, and their habitats that are managed by public resource agencies for public benefit.

12        33.    The AQDO applies in 13 states: Alabama, Arkansas, Florida, Georgia, Kentucky,

13   Louisiana, Minnesota, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, and

14   Texas. The order authorizes freshwater commercial aquaculture producers to take DCCOs

15   committing or about to commit depredation of aquaculture stocks.  It also authorizes USDA

16   APHIS Wildlife Services employees to control DCCOs at roosts near aquaculture facilities.

17        34.    Five years after issuance of the Orders, with the expiration date looming, the

18   Agency conducted an EA that considered only three alternatives: no action, a five-year

19   extension, or an indefinite extension.  On April 6, 2009, FWS published a final regulation

20   extending the Orders for five years, through June 30, 2014.  50 C.F.R. § 21.47.

21        35.    As the *second* expiration date drew nearer, on November 8, 2011 the Agency

22   published a notice of intent to prepare an EA or SEIS to review potential revisions to regulations

23   governing the management of DCCOs.  *See Request for Comments; Migratory Bird Permits,*

1    *Double-Crested Cormorant Management in the United States,* 76 Fed. Reg. 216 (Nov. 8, 2011).

2    This request sought public input on specific questions, including whether and how the proposed

3    alternatives should be modified and which additional alternatives should be included.  *Id.*

4        36.    Ultimately, FWS received eighty-one letters from the public and agencies with

5    substantive suggestions on the November 8, 2011 notice of intent.  Some commenters suggested

6    that the overall objectives were misdirected and FWS neglected its responsibility to protect all

7    native waterbird species including DCCOs and to promote sound ecological and natural resource

8    use practices.  Some commenters suggested other alternatives to those proposed, including

9    focusing on local damage control while developing ecologically sustainable aquaculture and

10   fisheries practices and increasing social carrying capacity for cormorants.  Comments on the

11   Notice of Intent are available at www.regulations.gov by searching for FR Doc No. 2012-01807.

12       37.    In March 2014 FWS issued a proposed rule and draft EA (DEA).  The Agency

13   received thirty comments from individuals, organizations, State agencies, and Flyways on the

14   March 5, 2014, proposed rule and DEA.  Commenters (including several Plaintiffs) noted, *inter*

15   *alia*, the lack of evidence of a need for the Orders; lack of a proven link between DCCO

16   suppression and increased fish stocks; failure to consider other factors contributing to declines in

17   fish stocks such as overfishing, toxins, invasive species and the aquaculture industry's lack of

18   mechanisms to protect open ponds; deficiencies in state permit programs, including that of

19   Texas; FWS' failure to conduct a thorough review in the ample time it has had to do so;

20   deficiencies in the population modeling used in the DEA; failure to appropriately consider

21   alternatives; and the environmental implications of the use of lead bullets in killing DCCOs.

22   Comments on the proposed rule and DEA are available at www.regulations.gov by searching for

23   Docket ID: FWS-HQ-MB-2013-0135.

1    38.    On April 30, 2014, FWS published a final EA regarding the management of

2    DCCOs (2014 FEA).  Despite the Agency's request for input regarding alternatives, the 2014

3    FEA considered only three: allowing the Orders to expire, extending them for five additional

4    years, and extending them indefinitely.  United States Fish and Wildlife Service, "Final

5    Environmental Assessment: Management of Double-crested Cormorants Under 50 C.F.R. 21.47

6    and 21.28" (May 2014).  Despite having specifically solicited comments regarding topics such as

7    objectives and alternatives, the Agency admitted, "Due to resource limitations, we are unable to

8    complete full analysis of these proposals prior to the expiration of the AQDO and PRDO. . .

9    Issues raised in public comments on the 2011 notice will be addressed in detail in a subsequent

10    NEPA analysis." *Id*. at 18.

11    39.    On May 15, 2014, FWS published a FONSI concluding that extending the Orders

12    for five additional years would have no significant impact and that a full EIS was not required.

13    ***Facts evidencing fundamental problems in the Agency's description of the need for the***
14    ***proposal, as required by 40 C.F.R. § 1508.9(b) and the Agency's failure to meet its***
15    ***requirement to provide "sufficient evidence and analysis" for a FONSI determination, 40***
16    ***C.F.R. § 1508.9(a)(1).***

17    40.    During the period the Orders have been in effect, an estimated half million

18    DCCOs have been killed.  2014 FEA at 21-22.

19    41.    Although the Orders were based in large part on a perceived need to reduce

20    "conflict" between DCCOs and the aquaculture industry, the EA does not demonstrate that the

21    industry has benefitted economically or otherwise from the Orders.  Despite the tens of

22    thousands of DCCOs killed, the EA presents no data showing a widespread increase in fish

23    populations on the scale of the suppression of DCCOs.

24    42.    The "Purpose and Need for Proposed Action" section of the EA simply states that

25    FWS "anticipate[s] a continuing need to manage DCCOs to protect aquaculture and public

1    resources beyond the expiration dates of the [Orders]."  The Agency has had over a decade of

2    DCCO suppression to conduct research and gather results, yet has not devoted the time or the

3    resources to adequately studying the issue, and has been otherwise unable to prove that the

4    Orders accomplish their intended effect.

5            43.    Many of the scientific papers relied upon by FWS in the 2014 FEA are outdated,

6    fail to account for the drastic changes to the food web in recent years due to rampant invasive

7    species, and/or contain baseless assumptions and unsupported broad-based conclusions.  As just

8    one example, the *Schwiff* paper on the impact of DCCOs on central New York Finger Lakes

9    attributes all of the declines in the two fish species of interest (perch and walleyed pike) over a

10   fifteen year period to DCCO depredation, yet the paper provides no data on the number of

11   DCCOs using the lake in question or what they ate when on the lake, and ignores other

12   significant sources of fish decline such as the ten-fold increase in fishing licenses in the period

13   immediately preceding the decline.

14           44.    Conversely, the 2014 FEA ignores a crucial study undertaken by researchers from

15   the University of Minnesota's Department of Fisheries, Wildlife, and Conservation Biology in

16   2012 showing significant declines in the Great Lakes populations of DCCOs.  Linda R. Wires,

17   Francesca J Cuthbert and Todd Arnold, *Advancing Great Lakes Colonial Waterbird Monitoring*

18   *Priorities: Sampling and Collaboration*, (June 2013).  Despite having commissioned this study,

19   FWS fails to mention it in the 2014 FEA, even though the study suggests major changes in

20   circumstance that warrant careful consideration in a full EIS.

21           45.    The 2014 FEA fails to examine the potential *beneficial* impacts to economically

22   significant fish populations from DCCOs living in complex ecological communities.

1 ***Facts pertaining to the CEQ regulations' definition of a "significant" impact requiring an***
2 ***EIS, 40 C.F.R. § 1508.27(b), and the Agency's failure to meet its requirement to provide***
3 ***"sufficient evidence and analysis" for a FONSI determination, 40 C.F.R. § 1508.9(a)(1).***

4     46.     Despite the CEQ regulation defining the significance of an impact in part in

5 relation to "[t]he degree to which the possible effects on the environment are highly uncertain or

6 involve unique or unknown risks," 40 C.F.R. § 1508.27(b)(5), FWS does not make uncertainty a

7 factor in deciding whether the Orders have a "significant" impact.  To the contrary, the EA itself

8 acknowledges the high level of uncertainty regarding fish populations:  a primary justification

9 for the Orders.  FWS admits that "[t]he wide range of biotic and abiotic factors that impact fish

10 populations and the complexity and challenges in studying aquatic systems make it difficult to

11 demonstrate a cause and effect relationship between DCCO predation and fish populations,"

12 2014 FEA at 10.  Yet, the EA concludes that the impact is not significant for NEPA purposes.

13     47.     Despite the CEQ regulation defining the significance of an impact in part in

14 relation to "[t]he degree to which the effects on the quality of the human environment are likely

15 to be highly controversial," 40 C.F.R. § 1508.28(b)(4), FWS does not weigh potential

16 controversy in deciding whether the Orders have a "significant" impact.  DCCO management is

17 a highly controversial topic.  Books such as *The Double-crested Cormorant, Symbol of*

18 *Ecological Conflict* by Dennis Wild (University of Michigan Press, 2012) and *The Double-*

19 *crested Cormorant: Plight of a Feathered Pariah* by Linda Wires (Yale University Press, 2014),

20 and *The Devil's Cormorant: A Natural History* by Richard King (University of New Hampshire

21 Press, 2013) explore the heated controversy regarding the effects of cormorants and the killing of

22 cormorants on the quality of the human environment.  Indeed, a basic internet search using the

23 words "cormorant," "management," and "controversy" yields over two million results, including

24 books, scholarly articles, newspaper and media reports, and blogs.

1    48.     Despite the CEQ regulation defining the significance of an impact in part in

2  relation to "[t]he degree to which the action may establish a precedent for future actions with

3  significant effects or represents a decision in principle about a future consideration," 40 C.F.R.

4  § 1508.27(b)(6), FWS ignores the potential precedential effects of this *second* five year

5  extension of the Orders without thorough review under NEPA.

6    49.     Despite the requirement to prepare supplements to draft or final EISs when there

7  are "significant new circumstances or information relevant to environmental concerns and

8  bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(ii), FWS ignores

9  information in its own EA suggesting declines in DCCO populations.  In the U.S. Great Lakes

10  region, where DCCOs are most actively managed, the 2014 FEA indicates that the number of

11  DCCO breeding pairs has declined by 13.3% from 2005 to 2011.  The 2014 FEA also cites to

12  data collected by USDA APHIS Wildlife Services and the USDA APHIS National Wildlife

13  Research Center during an annual mid-winter roost survey in Mississippi and Alabama

14  (important states for aquaculture) indicating that DCCO population declined by 46% from 2004

15  to 2013.  Despite these significant declines, FWS does not consider within the 2014 FEA

16  whether the changed circumstances in either the Great Lakes region or the Mississippi/Alabama

17  region warrant changes in species management.

18    50.     Similarly, despite the requirement to prepare supplements to draft or final EISs

19  when there are "significant new circumstances or information relevant to environmental

20  concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(ii), FWS fails

21  to consider the radical decline of the catfish industry in relation to the asserted "need" for a

22  continuation of the orders.  The 2014 FEA indicates a major decline in the catfish aquaculture

23  industry in Arkansas, Alabama, and Mississippi (noted in the 2003 FEA as primary aquaculture

1   states) in the past 13 years. From 2002 to 2013, the number of water acres devoted to catfish

2   farming in Arkansas declined by 78% (38,000 acres to 8,200 acres). From 2001 to 2013, the

3   number of water acres devoted to catfish farming in Mississippi declined by 57% (112,700 acres

4   to 48,600 acres). From 2002 to 2013, the number of water acres devoted to catfish farming in

5   Alabama declined by 30% (25,900 acres to 18,200 acres).  However, FWS does not consider

6   whether the decline in catfish farming warrants any change in DCCO management.  In addition,

7   FWS does not consider that in the more than forty years the catfish industry has existed, catfish

8   farmers in these states have made few, if any, modifications to their ponds to protect them from

9   DCCO predation.

10      51.     Texas and South Carolina – and potentially other states in the future – have

11  DCCO hunting permit programs that contain limited if any oversight mechanisms and allow the

12  killing of DCCO without compliance with the terms of the PRDO.  The EA does not consider the

13  potentially significant environmental effects of these non-compliant state DCCO hunting

14  programs nor does it provide for adequate oversight of state-run programs.

15      52.     In Texas, for example, any private citizen with a hunting license, thirteen dollars,

16  and landowner permission can get a permit to shoot at DCCO on private land.  This is despite

17  FWS's acknowledgement that "there is little or no evidence that DCCOs are adversely impacting

18  fishery resources in Texas, nor that DCCO control activities are having a beneficial effect on

19  those resources."  2014 FEA at 30.  When FWS issued its FONSI, it admitted that the Texas

20  program was not in compliance with the PRDO because it allowed take on private lands, and

21  stated that it would ensure that Texas remedied the problem, or FWS would eliminate Texas

22  from the list of states authorized to implement the PRDO.  Despite these assurances, the program

23  remains unchanged; FWS has not suspended the program nor has it removed Texas from the list.

53.     In South Carolina in one month alone in 2014 private hunters acting under the authority of the PRDO killed over 11,000 cormorants, with sixty percent of permit holders failing to turn in required documentation.  Joey Holleman, *SC Hunters Kill More Than 11,000 Cormorants*, The State, (April 4, 2014), www.thestate.com/2014/04/04/3368510/exclusive-sc-hunters-kill-more.html.  Since both Orders have been in place, the total yearly continental kill of DCCO has averaged 43,423 per year; thus South Carolina's decision to sponsor this one hunting event alone will increase the continental total for 2014 by a staggering 25%.  If other states follow suit – particularly in areas where DCCOs overwinter – the yearly kill numbers that FWS used in its modeling could turn out to be wildly conservative.  Such unregulated, unsupervised, and non-coordinated state killing plans could significantly damage the entire interior DCCO population in a single year.  The 2014 FEA fails to account for this possibility.

54.     Although the Orders require nontoxic shot for users of shotguns, those using rifles may continue using lead-based ammunition through January 1, 2017, introducing toxic lead into the environment through the soft and easily fragmented bullets.   Beginning on that date, persons using centerfire rifles must use bullets that contain no more than 1% lead, but until then, the Orders allow for actions that may threaten fragile aquatic ecosystems and endanger scavenging animals.  Moreover, the Orders require non-toxic bullets only for center-fire rifles, not for rim-fire rifles, including the ubiquitous .22 caliber, or for handguns.  The 2014 FEA does not consider the potentially significant environmental effects of the introduction of toxic lead into the environment which is permitted by the Orders.

55.     The 2014 FEA does not adequately address the effects upon co-nesting and look-alike species.  Although the Orders specify that they do not authorize the take of other species including two look-alike species (the anhinga and the neotropic cormorant), and although the

1  Orders require persons operating under them to report the take of a migratory bird species other

2  than DCCOs, the Orders do not provide for hunter training or adequate supervision to ensure that

3  hunters avoid harming co-nesting and look-alike species, and that they report those accidentally

4  killed.  This is particularly problematic in states that rely on untrained or minimally trained

5  private citizens to correctly identify and report the birds that they kill.  The 2014 FEA does not

6  adequately address effects upon co-nesting species, other than those protected by the Endangered

7  Species Act.

8       56.     Finally, despite the requirement to "study, develop, and describe appropriate

9  alternatives to recommended courses of action in any proposal which involves unresolved

10  conflicts concerning alternative uses of available resources," as required by 42 U.S.C.

11  § 4332(2)(E) and 40 C.F.R. § 1508.9(b), the 2014 FEA does not adequately consider alternatives

12  to extending the Orders for five additional years, including the alternatives originally considered

13  in 2003 or those proposed by commenters in response to the Agency's November 8, 2011 request

14  for comments, which specifically sought information on possible alternatives.

15                    **CLAIM FOR RELIEF**

16  **DEFENDANTS HAVE VIOLATED NEPA, IMPLEMENTING CEQ REGULATIONS,**
17  **AND THE APA BY FAILING TO PRODUCE AN EIS FOR A MAJOR FEDERAL**
18  **ACTION SIGNIFICANTLY AFFECTING THE QUALITY OF THE HUMAN**
19  **ENVIRONMENT, BY REACHING A FONSI BASED ON AN INSUFFICIENT EA, AND**
20  **BY FAILING TO ADEQUATELY CONSIDER ALTERNATIVES TO THE PROPOSED**
21  **ACTION.**
22

23       57.     Plaintiffs allege and incorporate by reference each and every allegation set forth

24  in the paragraphs above.

25       58.     The five-year extension of the Orders constitutes a major federal action

26  significantly affecting the quality of the environment under 42 U.S.C. § 4332(C) and

1 implementing CEQ regulations. Thus, NEPA requires Defendants to prepare an EIS and

2 Defendants violated NEPA by failing to do so.

3      59.     Defendants violated NEPA by reaching a FONSI based on a flawed and

4 insufficient EA that fails to "provide sufficient evidence and analysis" for the conclusion of no

5 significant impact, as required by 40 C.F.R. § 1508.9(a)(1); fails to adequately demonstrate the

6 need for the proposed action as required by 40 C.F.R.  § 1508.9(a)(b); and fails to adequately

7 "study, develop, and describe appropriate alternatives to recommended courses of action in any

8 proposal which involves unresolved conflicts concerning alternative uses of available resources,"

9 as required by 42 U.S.C. § 4332(2)(E).

10      60.     FWS's action is arbitrary, capricious, contrary to law, and therefore in violation of

11 the NEPA and the APA.

12 **PRAYER FOR RELIEF**

13 WHEREFORE, plaintiffs respectfully request that the Court:

14      A.     Declare that Defendants violated NEPA and the APA by failing to conduct an EIS

15 for the Agency's five-year extension of the Orders, and by issuing a FONSI based upon an

16 inadequate EA.

17      B.     Enter an order vacating Defendants' decision to re-extend Orders until such a

18 time as the Agency achieves full compliance with NEPA;

19      C.     Grant such preliminary or permanent injunctive relief as Plaintiffs may from time

20 to time request during the pendency and resolution of this case to ensure that Defendants do not

21 irreparably injure DCCOs;

D.      Award Plaintiffs their reasonable litigation expenses, including attorney fees,

expert witness fees, court costs, and other expenses necessary for the preparation and litigation of

this case under the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.; and

E.      Grant such additional relief as the Court deems just and proper.


Respectfully submitted this 29th day of October, 2014.

_____/s/_____

Paula Dinerstein, DC Bar No. 333971
Senior Counsel
Public Employees for Environmental Responsibility
2000 P Street, NW, Suite 240
Washington, D.C. 20036
(202) 265-7337

Laura Dumais, DC Bar Pending
Staff Counsel
Public Employees for Environmental Responsibility
2000 P Street, NW, Suite 240
Washington, D.C. 20036
(202) 265-7337