## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PUBLIC EMPLOYEES FOR
ENVIRONMENTAL RESPONSIBILITY,
et al.,

        Plaintiffs,

        v.

UNITED STATES FISH AND WILDLIFE
SERVICE, et al.,

        Defendants.

Civil Action No. 14-1807 (JDB)

## MEMORANDUM OPINION

Plaintiffs seek review of the U.S. Fish and Wildlife Service's decision to reissue two orders that authorize the killing of double-crested cormorants ("cormorants" or "DCCOs") in certain states. The parties have filed cross-motions for summary judgment. Because defendants failed to comply with their obligations under the National Environmental Policy Act ("NEPA"), the Court will grant plaintiffs' motion and deny defendants' cross-motion.

## BACKGROUND

### I.    National Environmental Policy Act

NEPA is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a), and it requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action, Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 374 (1989); see 42 U.S.C. § 4332(C). The statute's requirements are "essentially procedural." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558 (1978). "The major 'action-forcing' provision of NEPA is the requirement that 'all agencies of the Federal

government' prepare a detailed environmental analysis for 'major Federal actions significantly affecting the quality of the human environment.'" Found. on Econ. Trends v. Heckler, 756 F.2d 143, 146 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C); S. Rep. No. 91-296, at 19 (1969)).  This analysis is called an Environmental Impact Statement ("EIS").

An EIS is not required if the agency determines that the proposed action would not have a significant impact on the environment.  Sierra Club v. Mainella, 459 F. Supp. 2d 76, 81 (D.D.C. 2006) (citing 40 C.F.R. §§ 1501.4, 1508.13).  A finding of no significant impact can be made based on a more limited document, called an Environmental Assessment ("EA").  Id.  "The EA is to be a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'"  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).  "When preparing an EA, federal agencies must include a brief discussion of alternatives to the proposed action."  Biodiversity Conservation All. v. U.S. Bureau of Land Mgmt., 404 F. Supp. 2d 212, 218 (D.D.C. 2005) (internal quotation marks and brackets omitted); see 40 C.F.R. § 1508.9(b); see also 42 U.S.C. § 4332(E) (requiring that an agency "study, develop, and describe appropriate alternatives to recommended course of action"). "If, pursuant to the EA, an agency determines that an EIS is not required under applicable . . . regulations [issued by the Council on Environmental Quality ("CEQ")], it must issue a finding of no significant impact (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  Dep't of Transp., 541 U.S. at 757–58 (internal quotation marks omitted).

An agency's compliance with the procedural requirements of NEPA is subject to the arbitrary and capricious standard of review.  See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,

Inc., 462 U.S. 87, 90 (1983); Nat'l Tr. for Historic Pres. v. Dole, 828 F.2d 776, 781 (D.C. Cir. 1987).

## II.   The Orders

The two orders at issue in this lawsuit—the Aquaculture Depredation Order ("AQDO"), 50 C.F.R. § 21.47, and the Public Resource Depredation Order ("PRDO"), id. § 21.48 (collectively, the "Orders")—have been reissued every five years since their initial promulgation in 1998 and 2003, respectively.  The AQDO was adopted by the U.S. Fish and Wildlife Service ("FWS") in 1998 in response to complaints that the fish-eating habits of the cormorants were becoming increasingly costly to aquaculture and other industries.  See Fund for Animals v. Kempthorne, 538 F.3d 124, 128 (2d Cir. 2008).  The AQDO authorized "[l]andowners, operators, and tenants actually engaged in the production of commercial freshwater aquaculture stocks (or their employees or agents)" in certain states to take cormorants "when found committing or about to commit depredations to aquaculture stocks."  Migratory Bird Permits; Establishment of a Depredation Order for the Double-Crested Cormorant, 63 Fed. Reg. 10,550, 10,560 (Mar. 4, 1998) (to be codified at 50 C.F.R. § 21.47).  In other words, the order permitted the killing of double-crested cormorants when they threatened to eat commercially raised fish stock.  The authority granted by the AQDO would "automatically expire on April 30, 2005, unless revoked or specifically extended prior to that date."  Id. at 10,561.

The next year, in response to continued complaints, FWS issued a Notice of Intent to develop a national cormorant plan.  See Migratory Bird Permits; Notice of Intent To Prepare an Environmental Impact Statement and National Management Plan for the Double-Crested Cormorant, 64 Fed. Reg. 60,826 (Nov. 8, 1999).  In 2003 the agency issued a final EIS, which presented six alternatives for the management of double-crested cormorants: (1) no action (continuation of existing management practices); (2) only non-lethal management techniques; (3)

expansion of existing management policies; (4) a new depredation order; (5) reduction of regional cormorant populations; and (6) frameworks for a cormorant hunting season.  U.S. Fish & Wildlife Serv., Final Environmental Impact Statement: Double-crested Cormorant Management in the United States at 13–21 (2003); see Migratory Bird Permits; Regulations for Double-Crested Cormorant Management, 68 Fed. Reg. 58,022, 58,023 (Oct. 8, 2003).  The EIS recommended the fourth of these alternatives: issuance of a new depredation order.  68 Fed. Reg. at 58,023. Accordingly, FWS promulgated the PRDO, which authorized "[s]tate fish and wildlife agencies, Federally recognized Tribes, and State Directors of the Wildlife Services program of the U.S. Department of Agriculture Animal and Plant Health Inspection Service" to "take" cormorants found committing or about to commit depredations on the public resources of fish.  Id. at 58,035 (to be codified at 50 C.F.R. § 21.48).  The agency also amended the AQDO.  Kempthorne, 538 F.3d at 130.  Both orders, issued in 2003, would expire on April 30, 2009.  See 50 C.F.R. § 21.47(f) (2004); id. § 21.48(f) (2004).  In 2009, they were reissued for another five years.  Migratory Bird Permits; Revision of Expiration Dates for Double-Crested Cormorant Depredation Orders, 74 Fed. Reg. 15,394 (Apr. 6, 2009) (to be codified at 50 C.F.R. §§ 21.47, 21.48).

Not long after that, FWS again began its reevaluation of the Orders, which would expire on June 30, 2014.  See 50 C.F.R. § 21.47(f) (2009); id. § 21.48(f) (2009).  In November 2011, the agency sought comments on its plans to conduct an EA or EIS to review "potential revisions to regulations governing the management of DCCOs."  U.S. Fish & Wildlife Serv., Final Environmental Assessment: Management of Double-Crested Cormorants Under 50 CFR 21.47 and 21.48 (May 2014) at 2 [A.R. 1879] ("EA").  After receiving more than 80 public comments, FWS decided not to review potential revisions and conducted an EA instead of an EIS.  Id.  A 2013 internal email sheds some light on that decision:

4

> [T]he strategy has changed regarding revision of the DCCO regulations. Because of other priorities at Headquarters, the resources aren't available at this time to complete a Supplemental EIS in order to revise the regulations. So, plan is to revise the 2009 Final Environmental Assessment with the intent of renewing the existing regulations until the resources are available to prepare a [Supplemental] EIS.

Email from Terry Doyle, Sept. 3, 2013 [A.R. 4927]. In the resulting environmental assessment, FWS considered three alternatives: (1) no change to the orders, which would therefore expire on June 30, 2014; (2) amend the orders to extend the expiration dates from June 30, 2014, to June 30, 2019; or (3) amend the orders to remove the expiration dates. EA at i [A.R. 1873]. FWS decided on another five-year extension. Migratory Bird Permits; Extension of Expiration Dates for Double-Crested Cormorant Depredation Orders, 79 Fed. Reg. 30,474 (May 28, 2014).

## III.   The Current Action

Plaintiffs Ken Stromborg, Bill Koonz, James Ludwig, Mark Tweedale, Dennis Wild, and Public Employees for Environmental Responsibility (collectively, PEER) argue that defendants FWS and FWS Director Daniel M. Ashe (collectively, FWS) violated NEPA when the agency reissued the Orders in 2014 without first preparing an EIS. Pls.' Mem. in Supp. of Mot. for Summ. J. [ECF No. 21-1] at 17–30 (Pls.' Mem.). Additionally, PEER contends that the EA was deficient: "FWS violated NEPA by relying on an [EA] that is insufficient to justify the agency's finding of no significant impact . . . and by failing to consider reasonable alternatives." Pls.' Mem. at 1 (capitalization altered). PEER seeks declaratory and injunctive relief against FWS and has moved for summary judgment. The agency has cross-moved for summary judgment.

## ANALYSIS

### I.    Standing

Before the Court can address the merits of PEER's contentions, it must ensure that PEER has standing under Article III of the Constitution to raise its claims.   "The 'irreducible constitutional minimum' of Article III standing requires satisfaction of three elements: (1) a concrete and particularized and actual or imminent injury-in-fact that is (2) fairly traceable to the challenged action of the defendant . . . and (3) likely to be redressed by a favorable decision."   In re: Idaho Conservation League, 811 F.3d 502, 508 (D.C. Cir. 2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).   "In making this showing, Plaintiffs cannot rest on mere conclusory allegations but must set forth specific facts, either through affidavits or other evidence, which for purposes of the summary judgment motion will be accepted as true."   Am. Oceans Campaign v. Daley, 183 F. Supp. 2d. 1, 9 (D.D.C. 2000).   Harm to aesthetic or recreational interests can satisfy the injury prong of the test.   See Summers v. Earth Island Inst., 555 U.S. 488, 494 (2009).

Concerned that plaintiffs had not demonstrated the requisite injury-in-fact, the Court ordered PEER to address that issue.   Plaintiffs have now submitted several declarations that show particularized injuries to their recreational and aesthetic interests that are traceable to the two FWS Orders and that would likely be redressed if the Orders were vacated.   For example, plaintiff Mark Tweedale, a member of PEER, attests that he enjoys observing cormorants every day on the Dead Horse Bay in Green Bay, Wisconsin, from an observation tower in his front yard.   Tweedale Decl. [ECF No. 32-4] at 1.   He states that the FWS Orders, by reducing the number of double-crested cormorants, adversely affect his recreational and aesthetic interests in watching the birds.   Id. at 2.

Based on the declarations now in the record, plaintiffs have standing to bring their claims. Standing was not contested by FWS.  Defs.' Resp. to Order to Show Cause [ECF No. 34].

## II.   NEPA Claims

An environmental assessment must discuss appropriate alternatives to the proposed action as well as the environmental impacts of the proposed action and the possible alternatives.  See 40 C.F.R. § 1508.9(b) (referring to 42 U.S.C. § 4332(E)).  FWS's 2014 EA comes up short on both scores.

### A.  FWS did not take a hard look at environmental impacts

PEER argues that the 2014 EA is insufficient to justify FWS's finding of no significant impact.  Pls.' Mem. at 30–36.  To evaluate an agency's finding of no significant impact, a court must consider whether the agency has satisfied four requirements.  First, the agency must have accurately identified the relevant environmental concern.  Second, once the agency has identified the problem, it must have taken a "hard look" at the problem in preparing the EA.  Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.  And last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that the changes or safeguards in the project sufficiently reduce the impact to a minimum.  Grand Canyon Tr. v. FAA, 290 F.3d 339, 340–41 (D.C. Cir. 2002).

PEER attacks the EA on the ground that FWS did not take the requisite "hard look" at the Orders' effect on cormorant populations.  Pls.' Mem. at 33.  An agency has taken a "hard look" at the environmental impacts of a proposed action if "the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well-considered."  Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1324–25

(D.C. Cir. 2015) (internal quotation marks omitted).  To evaluate whether the EA contained "sufficient discussion" of the environmental impact on cormorant populations, this Court predictably begins by looking at the section of the EA that analyzed "impacts to DCCO populations" if the Orders were extended for five years "until 2019." EA at 37 [A.R. 1914].  There the EA employed four population models to predict the number of breeding pairs of cormorants that would remain if the Orders stayed in effect for five more years.  So far so good.  But there is a glaring defect that undermines any confidence in that analysis: the EA's predictions under each model estimate the impact on the double-crested cormorant population <u>by 2014</u>—not by 2019.

It seems that rather than take a "hard look" at the impacts on cormorant populations if the Orders were extended through 2019, FWS simply lifted the findings from its 2009 EA regarding the expected impact of extending the Orders through 2014.  Several comments on an annotated draft version of the 2014 EA, which was circulated internally within FWS, instruct that the numbers in the section at issue should be updated for 2019.  U.S. Fish & Wildlife Serv., Draft Environmental Assessment: Extended Management of Double-Crested Cormorants Under 50 CFR 21.47 and 21.48 at 46–49 [A.R. 0335–38] ("Draft EA").  But in the final EIS, the numbers and text remained largely unrevised.  <u>Compare</u> EA 37–38 [A.R. 1914–15], <u>with</u> Draft EA at 46–49 [A.R. 0335–38].  The final 2014 EA, therefore, contains a nearly carbon copy of the impacts analysis from the 2009 EA.

For example, in the 2009 EA, FWS stated: "If harvest and egg oiling remain at current rates, we estimate the population would decline approximately 20% by 2014 . . . . The estimated population size of breeding individuals in 2014 would be 172,400." U.S. Fish & Wildlife Serv., Final Environmental Assessment: Extended Management of Double-Crested Cormorants Under 50 C.F.R. 21.47 and 21.48, at 25 (Mar. 2009).  Flash forward five years to the 2014 EA where

FWS said the exact same thing: "If harvest and egg oiling remain at current rates, we estimate the population would decline approximately 20% by 2014 . . . . The estimated population size of breeding individuals in 2014 would be 172,400." EA at 37 [A.R. 1914]. FWS did not bother to update to 2019 its estimates under three of the four population models used to assess impacts to cormorant populations. It is hard to imagine a "softer" look.

And yet, FWS "predict[ed] with confidence that continued cormorant control under the depredation orders will not threaten the long-term sustainability of regional DCCO populations." EA at 37 [A.R. 1914]. That conclusion is entirely unsupported by the impacts analysis, which was not even revised to reflect the latest five-year extension. FWS's unsubstantiated conclusion cannot survive judicial review. See Sierra Club, 459 F. Supp. 2d at 108 (holding agency failed to take a hard look at environmental impacts "as evidenced by the lack of explanations supporting its conclusions").[1]

### B.  FWS did not consider a reasonable range of alternatives

PEER also argues that FWS failed adequately to address alternatives as required by NEPA and the CEQ regulations. FWS responds that because the three alternatives it considered "are consistent with the defined purpose and need for the proposed action, the FWS fulfilled its obligation under NEPA to consider a reasonable range of alternative[s]." Defs.' Mem. in Supp. of Cross-Mot. for Summ. J. [ECF No. 24-1] at 21 (Defs.' Mem.). But FWS misstates its obligation. It is not enough that the alternatives it considered are consistent with the need for the proposed

---

[1] Plaintiffs ask the Court to declare that FWS violated NEPA and the APA by issuing a FONSI based on an insufficient EA. See Compl. [ECF No. 1] at 20–21. Having determined that FWS failed to take a hard look at the impact of its proposed action on the cormorant population, the Court is now in a position to grant them that relief. Thus, it is unnecessary to reach plaintiffs' various other attacks on the 2014 EA—e.g., that the EA fails to identify all the relevant environmental impacts such as concerns related to "allowing lead-based ammunition," Pls.' Mem. at 31–32, and fails to take a "hard look" at matters like the impact on co-nesting and look-alike species, id. at 33–34.

action.  Rather, FWS must address the accusation that it improperly excluded from consideration <u>additional</u> reasonable alternatives that would <u>also</u> meet the agency's objectives.

"[A]n alternative is properly excluded from consideration . . . only if it would be reasonable for the agency to conclude that the alternative does not bring about the ends of the federal action." <u>City of Alexandria v. Slater</u>, 198 F.3d 862, 867 (D.C. Cir. 1999) (internal quotation marks omitted).  The "need" articulated by FWS in the 2014 EA is "to manage DCCOs to protect aquaculture and public resources beyond the expiration dates of the PRDO and AQDO."  EA at 2 [A.R. 1879].  The agency's record, however, shows that alternatives were excluded from consideration not because they could not satisfy the stated need—the management of double-crested cormorants—but simply because of resource limitations.  In the 2014 EA, FWS acknowledged—in a section entitled "ISSUES NOT CONSIDERED IN DETAIL"—(1) that it had "received several suggestions for new alternatives and modifications to alternatives analyzed in the [2003 EIS]"; (2) that "the current system may not be ideal"; and (3) that it was "unable to complete full analysis" of proposals for new alternatives or modifications to the alternatives considered in 2003 "[d]ue to resource limitations."  EA at 18 [A.R. 1895].  By the agency's own admission, then, it excluded alternatives from consideration without regard to whether those alternatives would achieve the stated objectives.  Instead, they were excluded solely because resources were not available to assess them.  Hence, the Court cannot conclude that the three alternatives actually discussed in the 2014 EA are "representative of the spectrum of available methods."  <u>Biodiversity Conservation All.</u>, 404 F. Supp. 2d at 218.  By unreasonably excluding other alternatives from consideration, FWS violated its NEPA obligations.  <u>See</u> <u>Sierra Club v. Watkins</u>, 808 F. Supp. 852, 871–75, 877 (D.D.C. 1991) (holding that an EA that did not consider a reasonable range of alternatives was "legally defective"); <u>cf.</u> <u>Ctr. for Food Safety v. Salazar</u>, 898

F. Supp. 2d 130, 148 (D.D.C. 2012) (finding that alternatives that were "inconsistent" with the agency's "overall objectives" were properly excluded from further examination).

It is not lost on the Court that agencies must work within limited budgets and, in the real world of resource constraints, cannot pursue all their policy goals at once.  Rather, they must prioritize based on what they can afford to do.  In this case, it seems that FWS chose only to consider options that "would not result in changes to current management strategies" because considering changes to that scheme would require the expenditure of resources that the agency did not have.  See EA at 2 [A.R. 1879].  But NEPA's requirement to consider appropriate alternatives takes that option off the table.  See Biodiversity Conservation All., 404 F. Supp. 2d at 218.  Facing the expiration of the two depredation Orders, FWS had two choices: (1) take action and in doing so comply with NEPA's requirement to consider appropriate alternatives, or (2) let the Orders expire and take action at such time as FWS was able to comply with NEPA.  What FWS could not do was decide to take action by issuing a five-year renewal of the Orders while declining to consider appropriate alternatives because doing so would require too many resources.

FWS seeks to avoid this conclusion by pointing to its 2003 EIS, which considered a broad range of alternatives.  According to the agency, it did not need to reconsider alternatives already analyzed in its earlier EIS because the 2014 "EA is tiered from and incorporates the 2003 EIS."  Defs.' Mem. at 20.  "Tiering" is a term of art that "refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions."  40 C.F.R. § 1508.28; see Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 511–12 (D.C. Cir. 2010).  The CEQ regulations provide for two circumstances where

tiering is appropriate: when the sequence of statements or analyses is (a) from a program, plan, or policy EIS to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis, or (b) from an EIS on a specific action at an early stage (such as need and site selection) to a subsequent statement or analysis at a later stage (such as environmental mitigation). 40 C.F.R. § 1508.28(a), (b). In other words, tiering is appropriate when an agency is examining a smaller part of the larger project or a subsequent part of the same project.

But that is not what FWS was doing in this case. Here it was examining a new order to replace an equally broad predecessor order. The regulations do not contemplate tiering under these circumstances. FWS has offered no response to PEER's argument that tiering applies "only in particular circumstances," Pls.' Resp. in Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply [ECF No. 25] at 13, and the Court sees no basis to condone the use of tiering outside of the situations contemplated by the CEQ regulations.

FWS's tag-on claim that the 2014 EA "incorporates" the 2003 EIS, see Defs.' Mem. at 20, fares no better. The CEQ regulations provide specific instructions for incorporation by reference: agencies may "incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statements and its content briefly described." 40 C.F.R. § 1502.21. There is no indication in the "alternatives" and "environmental impacts" sections of the 2014 EA that any earlier findings are being incorporated by reference. By comparison, the "affected environment" section of the EA "incorporate[s] by reference the material contained in Chapter 3 of the FEIS." EA at 4 [A.R. 1881]. Clearly, the agency knows how to incorporate by reference when it wants to. It did not do so with regard to its assessment of alternatives in Chapters 2 and 4 of the 2003 EIS. And FWS cannot accomplish post hoc in this litigation what it did not

do in the 2014 EA itself.  The Court concludes that the 2014 EA's consideration of alternatives does not include the broader consideration of alternatives in the 2003 EIS.

Moreover, even if the 2014 EA could be read to incorporate the alternatives considered in the 2003 EIS, the agency's analysis of those alternatives in 2003 would still not suffice.  The 2014 EA confirms that circumstances have changed since the 2003 EIS, including "drastic" declines in certain fish populations and "several changes in the aquaculture industry."  See EA at 7, 9 [A.R. 1884, 1886].  Incorporation of a ten-year-old assessment of alternatives from the 2003 EIS would not account for such changes.  Hence, FWS's purported (post hoc) reliance on its ten-year-old assessment of certain alternatives cannot be considered reasonable.

Finally, FWS cites a Ninth Circuit case for the proposition that its "obligation to consider alternatives under an EA is a lesser one than under an EIS."  Defs.' Mem. at 19 (citing Native Ecosystem Council v. U.S. Forest Serv., 428 F.3d 1233, 1246 (9th Cir. 2005)).  It is true that some courts have held that "[i]n an environmental assessment, the range of alternatives an agency must consider is smaller than in an environmental impact statement."  North Carolina v. FAA, 957 F.2d 1125, 1134 (4th Cir. 1992).  The Court also recognizes that the law in this Circuit regarding consideration of alternatives under NEPA stems from challenges to environmental impact statements, not EAs.  See City of Alexandria, 198 F.3d at 867.  But courts in this district have not hesitated to apply the same general standards to their evaluation of EAs.  See, e.g., Ctr. for Food Safety, 898 F. Supp. 2d at 146–47 (applying City of Alexandria to assess the sufficiency of the alternatives considered by FWS in an EA).  And even if EAs generally are held to some lesser standard, this EA would still fall short because of the explicit admission by FWS that it declined to consider changes to the regulations for purely budgetary reasons.  Allowing an agency to defend an EA on the ground that it lacks the resources to examine alternatives has the potential to

eviscerate NEPA, since many an agency would frequently so argue.  The Court is aware of no case condoning an agency's failure to examine alternatives in an EA solely on the ground of unavailability of resources.

### C.  The errors are not harmless

The D.C. Circuit has instructed courts to take account of the prejudicial error rule in the NEPA context, <u>Nevada v. Dep't of Energy</u>, 457 F.3d 78, 90 (D.C. Cir. 2006), meaning a court should not upset an agency decision for errors that are "not material to the ultimate finding," <u>Allison v. Dep't of Transp.</u>, 908 F.2d 1024, 1029 (D.C. Cir. 1990) (internal quotation marks omitted).  Here, however, the Court cannot conclude that the wholesale recycling of the 2009 analysis of impacts on cormorants was immaterial to the 2014 EA's finding of no significant impact.  First, the Court has no reason to believe that reliance on outdated numbers would not affect FWS's evaluation of the impacts on cormorants.  Indeed, it defies common sense simply to assume that the population of double-crested cormorants has remained unchanged since 2009 or that the predicted impact of extending the Orders would be exactly the same in 2014 as it was in 2009, when five years of "taking" have occurred in the interim.  The 2014 EA itself noted that "[t]he number of breeding DCCO pairs on the U.S. side apparently decreased an additional 6.5% from 2009 to 2011," although "the 2011 survey was not complete."  EA at 6 [A.R. 1883].  Second, when evaluating the overall environmental impact of orders explicitly designed to accomplish the reduction of this bird population, the impact on cormorants is not a trivial part of the inquiry.  FWS's error, therefore, is not harmless.

Nor is the failure to consider reasonable alternatives without consequences.  NEPA's requirement to consider alternatives is "an independent requirement of an EA, separate from its function to provide evidence that there is no significant impact."  <u>Sierra Club</u>, 808 F. Supp. at 870.

14

FWS was aware that its current approach "may not be ideal." Had it considered other reasonable approaches, it might have settled upon a different "preferred alternative." This error, therefore, was not immaterial to the decision to extend the Orders without substantive changes.

Because of these errors, the record is insufficient for the Court to determine whether an EIS, rather than just an EA, is required. How is the Court to know whether the Orders will have a significant effect on the environment, such that an EIS is required, when FWS failed to take the requisite hard look at a key environmental concern? Accordingly, the Court will grant PEER's motion for summary judgment without reaching the contention that FWS should have completed an EIS. See Grand Canyon Tr., 290 F.3d at 347 (remanding without deciding whether an EIS was required).

## III.   Remedy

That leaves the issue of remedy. In addition to declaratory relief, PEER has requested that the Court enter an order vacating FWS's 2014 re-extension of the Orders. Compl. [ECF No. 1] at 21. The remedy for a NEPA violation is governed by the APA, which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."). "Pursuant to the case law in this Circuit, vacating a rule or action promulgated in violation of NEPA is the standard remedy." Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("If an appellant has standing . . . and prevails on its APA claim,

it is entitled to relief under that statute, which normally will be a vacatur of the agency's order."));
see Am. Bird Conservancy, Inc. v. FCC, 516 F.3d 1027, 1029, 1032–34 (D.C. Cir. 2008) (per curiam) (vacating order because FCC failed to comply with NEPA).

Still, the Court has discretion in deciding appropriate relief based on what "equity demands." Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C. Cir. 1991). "The decision whether to vacate depends on the seriousness of the order's deficiency . . . and the disruptive consequences of an interim change that may itself be changed." Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) (internal quotation marks omitted).

The parties have not discussed the issue of relief in their summary judgment briefing, leaving the Court to speculate what consequences might follow from vacatur. The preferable course is to consider input from the parties. See Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt, 852 F. Supp. 32, 41–43 (D.D.C. 1994) (upon reconsideration of vacatur order, weighing the harm to the environment if a rule listing a species as "threatened" were vacated against the delay in economic and transportation plans if the rule remained in place). Therefore, the Court will allow the parties an opportunity—in accordance with the accompanying Order—to address the issue of remedy. The parties must address whether vacatur is proper and propose a remediation plan on remand.

## CONCLUSION

While "strict adherence to the language and purpose of NEPA" may be "unusual in a case that centers around the adequacy of an environmental assessment[,] . . . the statute puts in place a process for the consideration, documentation, and disclosure of environmental information in all governmental decisionmaking and it is not to be circumvented." Sierra Club, 808 F. Supp. at 876.

16

Courts "must be vigilant to insure that agencies pushing the line of NEPA compliance do not overstep it, else the statute becomes of little meaning." Id.  Here, the Court concludes that FWS has overstepped that line in two regards: the agency did not take a hard look at the Orders' effect on cormorant populations and failed to consider a reasonable range of alternatives.  For the reasons set forth above, PEER's motion for summary judgment will be granted and defendants' cross-motion will be denied.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  March 29, 2016