**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, et al., <br><br>      Plaintiffs, <br><br>      v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE, et al., <br><br>      Defendants. | Civil Action No. 14-1807 (JDB) |

## MEMORANDUM OPINION ON VACATUR

On October 29, 2014, plaintiffs Ken Stromborg, Bill Koonz, James Ludwig, Mark Tweedale, Dennis Wild, and Public Employees for Environmental Responsibility (collectively, PEER) brought suit against the Fish and Wildlife Service and FWS Director Daniel M. Ashe (collectively, FWS) to challenge the Service's extension of two depredation orders that authorize commercial freshwater aquaculture producers and states and tribes to kill double-crested cormorants. See 50 C.F.R. §§ 21.47, 21.48. On March 29, 2016, the Court granted plaintiffs' motion for summary judgment on their National Environmental Policy Act ("NEPA") claims and remanded the depredation orders to FWS. The same day, the Court ordered FWS to submit a proposed remediation plan and any comments on the injunctive relief sought by PEER. PEER was directed to file a response to the proposed plans. The issue of remedy is now ripe and before the Court.

## ANALYSIS

The remedy for plaintiffs' NEPA claim is governed by the Administrative Procedure Act, which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (emphasis added); see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.").  The Court, however, is not without discretion: "The decision whether to vacate depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed."  Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (internal quotation marks omitted).  Still, in this district, "vacating a rule or action promulgated in violation of NEPA is the standard remedy."  Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007); see Realty Income Tr. v. Eckerd, 564 F.2d 447, 456 (D.C. Cir. 1977) ("[W]hen an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance.").

A review of NEPA cases in this district bears out the primacy of vacatur to remedy NEPA violations.  See Reed v. Salazar, 744 F. Supp. 2d 98, 118–20 (D.D.C. 2010) (finding NEPA violation and ordering vacatur); Sierra Club v. Van Antwerp, 719 F. Supp. 2d 77, 78–80 (D.D.C. 2010) (finding NEPA violation and ordering remand with partial vacatur); Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp. 2d 183, 204–05, 210 (D.D.C. 2008) (finding NEPA violation and ordering vacatur); Humane Soc'y of U.S., 520 F. Supp. 2d at 37–38 (same); Greater

Yellowstone Coal. v. Bosworth, 209 F. Supp. 2d 156, 163–64 (D.D.C. 2002) (same); cf. Bldg. Indus. Legal Def. Found. v. Norton, 231 F. Supp. 2d 100, 101–02, 104–07 (D.D.C. 2002) (ordering vacatur where parties agreed that FWS had violated the Endangered Species Act); Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 17–21 (D.D.C. 2000) (finding NEPA violation and entering an injunction against the enforcement of the deficient rule).  And in the NEPA cases cited by defendants, where courts ordered remand without vacatur, the courts generally did so without explanation.  See, e.g., Idaho v. Interstate Commerce Comm'n, 35 F.3d 585, 599 (D.C. Cir. 1994); Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170, 187 (D.D.C. 2004).

Plaintiffs contend that this is not the type of case that merits departure from the presumptive remedy of vacatur.  Pls.' Mem. [ECF No. 38] at 8–13.  According to PEER, the deficiencies in the agency's environmental assessment ("EA") are significant whereas the disruptive consequences of vacatur are not.  Id. at 13–19.  FWS, on the other hand, believes that vacatur would indeed "have wide-ranging detrimental impacts," including environmental impacts, administrative burdens on FWS, and burdens on the regulated community.  Defs.' Mem. [ECF No. 37] at 6, see id. at 6–9.  For the reasons that follow, the Court is not convinced that rescinding the orders while FWS conducts its supplementary NEPA analysis will be so disruptive as to merit an exception from the standard remedy of vacatur.

FWS argues that vacatur will cause "substantial disruption to the regulated community and the Service," as well as "significant impacts to recreational fisheries and aquaculture industry." Id. at 8, see id. at 8–9.  Courts do consider disruptive impacts to the regulated industry in non-environmental cases.  See, e.g., Chamber of Commerce v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006) (considering "disruption to the mutual fund industry" if the Court were to vacate rule promulgated by the SEC).  But it is not clear that economic concerns are as relevant in an environmental case

like this one.  See Ctr. for Food Safety v. Vilsack, 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010) (expressing doubt over the propriety of considering "economic consequences . . . in environmental cases").  NEPA's focus is on "requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  Del. Riverkeeper Network v. FERC, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (emphasis added) (internal quotation marks omitted).  Absent a strong showing by FWS that vacatur will unduly harm economic interests like aquaculture or recreational fishing, the Court is reluctant to rely on economic disruption as the basis for denying plaintiffs the injunctive relief they seek.

Regardless, FWS has not made a compelling case that rescission will cause significant consequences to aquaculture because the forecasted harms are imprecise or speculative.  Cf. Bldg. Indus. Legal Def. Found., 231 F. Supp. 2d at 106 ("In assessing the 'disruptive consequences' of vacatur, the Court cannot rely upon intervenors' abstract policy arguments . . . ." (internal citation omitted)).  For example, FWS claims that "[f]isheries impacts can be in the millions of dollars" and that "the impacts to the aquaculture could be in the millions of dollars."  Defs.' Mem. at 8 (emphases added).  Not only do these consequences sound entirely conjectural, they are also disputed by PEER.  As to the impact on the aquaculture industry, for example, PEER argues that FWS has relied on decade old-figures from "the short-lived economic peak of the southern catfish industry."  2d Wild Decl. [ECF No. 38-2] ¶ 5.  Further, the projection of "millions of dollars" is based off of cormorant damage over a 20-year-period.  Ford Decl. [ECF No. 37-1] ¶ 15.  But the Court sees no reason to expect such protracted consequences.  FWS has represented that its supplemental analysis under NEPA will take only seven months.  Defs.' Mem. at 11.  In short, even if the Court were inclined to rely heavily on a disruption to commercial interests, FWS's

position that vacatur will cause detrimental economic impacts rests on very little substance or certainty.

Moving on to FWS's complaints about impacts to its own operations and the "regulated community," the Court finds the agency's concerns are frankly unexceptional.

> If the Court were to vacate the Orders, the immediate effect would be that activities the regulated community undertakes on a daily basis would have to stop until a depredation permit was submitted . . . . This reason alone provides ample rationale to leave the Orders in place, as courts repeatedly have exercised their discretion to avoid the vacatur of an agency action where such vacatur would cause serious disruption of an affected industry and entities.

Id. at 8.  The "activities" FWS has referenced are the killing of cormorants under the depredation orders the Court has found wanting.  If this argument were enough to carry the day, then it seems vacatur would never be appropriate.  Obviously the effect of vacatur is to stop these activities.  That "reason alone" cannot be enough.

FWS's prediction of environmental harms is similarly abstract.  "The Service estimates that the cormorant population would increase and stabilize at a higher number . . . ."  Ford Decl. ¶ 13.  That seems likely.  But how much higher?  And would that population increase be significant even though FWS represents that new final depredation orders can be issued in seven months?  Even assuming that the population does increase, FWS is noticeably tentative about the consequences of that cormorant population growth.  Defs.' Mem. at 7 ("[C]ormorants may cause habitat damage" due to increased excrement); id. ("Cormorants may also move in to areas where they may congregate and damage vulnerable species . . . .); id. ("In some locations this may shift predation pressure onto high conservation priority fish species.") (all emphases added).  These noncommittal representations are not compelling.  See Nat. Res. Def. Council v. EPA, 676 F. Supp. 2d 307, 314 (S.D.N.Y. 2009) (expressing skepticism over agency's position that vacatur

"<u>may</u> cause growers to use pesticides" (emphasis in original)).  And again they are countered by PEER, which argues, for example, that studies show that cormorants shift predation to invasive species not to important fish species.  2d Ludwig Decl. [ECF No. 38-1] ¶ 7.  Hence, while FWS may in the future be able to assemble a record that shows serious cormorant-caused environmental damage, their proffer at this time does not persuade the Court that vacatur of the depredation orders will cause serious environmental harm.

In fact, according to PEER, environmental harm will result if the orders are <u>not</u> rescinded. It goes without saying that if these orders are left in place, additional cormorants will be killed. Pls.' Mem. at 19.  As a result, PEER argues, certain beneficial ecosystem services that cormorants provide will be lost.  <u>Id.</u>  PEER's expert on colonial waterbirds James Ludwig attests that cormorants prey principally on invasive fish species and therefore reduce "burgeoning populations of invasive species that are known to harm sport fisheries."  2d Ludwig Decl. ¶¶ 9a, 15.  Ludwig also states that cormorants help co-nesting species because they "help create the type of habitat in which white pelicans—which cannot tolerate woody vegetation—thrive."  <u>Id.</u> ¶ 9.  In sum, FWS has not made a persuasive case that vacatur will cause detrimental environmental effects, particularly given the countervailing evidence offered by PEER that leaving the orders in place will have its own environmental consequences.

Moreover, if the Court were to vacate these orders, the parties agree that alternative routes remain available for the management of cormorant populations, for example, through individual predation permits under the Migratory Bird Treaty Act.  Pls.' Mem. at 3; Defs.' Mem. at 8; <u>see</u> 50 C.F.R. § 21.41.  According to FWS, "migratory bird permits could be requested and issued for the reduction of cormorant impacts on sensitive species or their habitats (vegetation)."  Ford Decl. ¶ 12.  While the Court understands the limitations of relying on state management plans and

individual permits, see Defs.' Mem. at 8, Ford Decl. ¶¶ 12, 18–20, particularly in the long term, the takeaway remains that any seriously detrimental impact of vacatur in the short term could be mitigated.  The availability of these alternative measures counsels in favor of vacatur.  North Carolina v. EPA, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (Rogers, J., concurring in granting rehearing) (explaining that vacatur may be appropriate when "other statutory and regulatory measures would mitigate the disruption caused by vacating the rule"); Bldg. Indus. Legal Def. Found., 231 F. Supp. 2d at 106 & n.5 (considering other regulatory protections that could protect certain species if the critical habitat designation were vacated).

Finally, FWS has not seriously contested that its EA was markedly deficient.  The failure to update its analysis from the previous renewal of the orders was striking.  And its examination of alternatives was nominal at best.  Therefore, the Court concludes that the appropriate remedy is vacatur on remand until FWS performs a new and legally adequate EA or environmental impact statement ("EIS") for national cormorant management orders in compliance with the requirements of NEPA.[1]

The Court concludes by advising FWS to take its remediation obligations seriously.  The Service has proposed that the job can be done in seven months, during which time it will amend its NEPA analysis, provide 30-day public comment, consider the comments, and prepare a final EA.  Defs.' Mem. at 10–12.  "At this time, FWS has no reason to believe this action, the five-year extension of the existing Orders, will require an EIS . . . ."  Id. at 11 (emphasis added).  The Court

---

[1] FWS requests that in the event of vacatur, the Court "exercise its equitable discretion to stay the effect of its order to allow the Service time to address NEPA and promulgate and issue a new rule."  Defs.' Mem. at 12–13.  While the D.C. Circuit has used this approach on occasion, see Chamber of Commerce v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006), the cases cited by FWS show that it is generally an interim measure used by courts where the plaintiffs agree that staying vacatur is appropriate.  See Anacostia Riverkeeper, Inc. v. EPA, 713 F. Supp. 2d 50, 55 (D.D.C. 2010); Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv., 288 F. Supp. 2d 7, 12 (D.D.C. 2003).  For the same reasons that the Court rejects FWS's request for remand without vacatur, the Court will not stay its order here.

cautions FWS that one could view its proposal suspiciously.  Plaintiffs have noticed that it sounds as if a "five-year extension of the existing Orders" is once again a foregone conclusion prior to the requisite assessment of environmental impacts and alternatives.  See Pls.' Mem. at 2.  On remand, FWS must make good on its promise to "develop reasonable alternatives that take into consideration the approaches suggested by . . . commenters" and "consider some alternatives from previous NEPA documents, some approaches that were suggested by commenters, and some new alternatives."  See Defs.' Mem. at 12; Ford Decl. ¶ 10 (listing four alternatives that FWS will consider).  The Court expects that FWS will use this consideration of alternatives to "foster excellent action," 40 C.F.R. § 1500.1(c), rather than as a "mere formality," Ctr. for Food Safety, 734 F. Supp. 2d at 953.  FWS must also take a hard look at the orders' effects on cormorants by updating its assessment framework.[2]

## CONCLUSION

For the foregoing reasons, the 2014 re-extensions of the Aquaculture Depredation Order, 50 C.F.R. § 21.47, and the Public Resource Depredation Order, id. § 21.48, issued by FWS in violation of NEPA will be vacated, and the orders remanded to FWS for proceedings consistent with this Opinion and the Court's March 29, 2016, Opinion and Order.  A separate order will issue with this opinion.

/s/

JOHN D. BATES
United States District Judge

Dated:  May 25, 2016

---

[2] PEER asks the Court to also require FWS to examine several factors that they continue to believe were insufficiently considered in the 2014 environmental assessment. Pls.' Mem. at 4–5. Having declined to decide whether FWS took a "hard look" at these issues in its summary judgment opinion, the Court will not endeavor to do so here.  One would expect that, upon remand, FWS will take care not to cut corners in its examination of the environmental impacts raised by commenters.